UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81572-CIV-MATTHEWMAN

JOSHUA L. BELLAMY,

          Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant
_____/

FILED BY _____KJZ_____ D.C.

**Sep 20, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## RENEWED[1] ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 31, 35]

THIS CAUSE is before the Court upon Plaintiff, Joshua L. Bellamy's ("Plaintiff") Motion for Summary Judgment [DE 31], and Defendant, Andrew Saul, Commissioner of Social Security's ("Defendant") Motion for Summary Judgment [DE 35]. The motions are fully briefed [DEs 36, 38, 39] and are ripe for review. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. FACTS

On January 23, 2018, Plaintiff filed a Title II application for a period of disability and

---

[1] On August 17, 2021, the United States Court of Appeals for the Eleventh Circuit in case number 21-11506-JJ issued an opinion in this case. [DE 61]. The Eleventh Circuit granted the parties' Consent Motion for Vacatur and Remand to the District Court and vacated this Court's Orders dated September 14, 2020, December 28, 2020, and March 5, 2021, as well as the Judgment dated March 5, 2020. The Eleventh Circuit additionally remanded the case "so that the district court can reassess its decision in light of *Carr* and conduct any additional proceedings that the court deems necessary in light of that intervening decision." The Undersigned held a status conference on September 20, 2021, during which counsel for Plaintiff and the Commissioner jointly agreed that the Order on Motions for Summary Judgment should be reinstated, along with the inclusion of additional language which is set forth at the conclusion of this Renewed Order.

disability insurance benefits and a Title XVI application for supplemental security income, asserting a disability on-set date of December 20, 2016. [R. 23].[2] The claims were denied initially and upon reconsideration. *Id.* Following a hearing on April 15, 2019, the ALJ issued a partially favorable decision on August 7, 2019. [R. 20-35]. A request for review was filed by Plaintiff with the Appeals Council and denied on September 23, 2019. [R. 11-13].

### A.   Hearing Testimony

The ALJ held a hearing on April 15, 2019. [R. 41]. Plaintiff appeared at the hearing unrepresented by an attorney and with his mother, Gloria Jean Bellamy. [R. 43]. He was 30 years old at the time of the hearing. [R. 71]. He testified that he had no medical records past February 5, 2019. [DE 47]. According to his testimony, Plaintiff is single and has no children. [R. 50-51]. He lives in a house in Boynton Beach, Florida, with his mother, brother-in-law, and oldest nephew. [R. 51]. At the time of the hearing, Plaintiff's driver's license had been suspended due to an unpaid speeding ticket. [R. 51].

Plaintiff graduated from high school and received a diploma. [R. 51-52]. He can read, write, and do simple math. [R. 51]. Plaintiff has had a series of jobs, including at McDonald's, Dollar General, and a legal office. [R. 52-53]. He most recently worked in May 2018 as a food service worker at a school for approximately 20 hours per week. [R. 53-54]. Plaintiff left the job because he "needed help"; however, he believes he can go back to that job. [R. 54]. When Plaintiff worked for Palm Beach County Schools, he had to work at various schools—wherever he was needed. [R. 55]. He never made much money or worked on a full-time basis at any of his jobs. [R. 56].

Plaintiff suffers from an anxiety disorder, schizophrenia with psychosis, a mood disorder,

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 12.

depression, hallucinations, and paranoia. [R. 57]. He also suffers from asthma, but the asthma does not prevent him from working, and he takes no medication for it. [R. 57, 67]. Plaintiff additionally has seizures, but medication does not really help and cannot be increased because he is taking the maximum dosage. [R. 66-67].

Plaintiff was Baker-acted in 2015 and 2017. [R. 58]. He was not taking medication at those times, but he was taking various prescription medications at the time of the April 15, 2019 hearing. [R. 58-59]. The medications, which include Trazodone, olanzapine, and Depakote, help him sleep and help with his visions and hallucinations. [R. 59, 66]. Plaintiff did not begin taking them until he left his most recent job. [R. 59]. He is not sure if he could work now. [R. 60]. He sees a psychiatrist every four weeks, and the doctor monitors his medications and inquires into how he is doing. [R. 60]. Plaintiff still tells his doctor that he is seeing and hearing things. [R. 60]. He gets weak sometimes, possibly due to his medications. [R. 61]. Plaintiff rarely drinks alcohol and uses no drugs. [R. 61].

Plaintiff has short-term memory problems and blanks out. [R. 62]. He still hears male voices almost every day and argues with them. [R. 62-63]. The voices tell him to kill himself and how to act. [R. 64]. Some of the voices are of people who bullied him when he was younger. [R. 65]. Plaintiff also heard them while he worked at the school. [R. 64]. Plaintiff has about three hallucinations per day involving snakes and people who are not there. [R. 65]. He reached out for help from a psychiatrist because he had stopped trusting people and was "freaking out." [R. 65].

On an average day, Plaintiff gets up at 10 or 11 a.m. [R. 66]. He can shower and get dressed by himself as he has no physical issues. [R. 67]. He does chores around the house, including cleaning and laundry. [R. 67-68]. Plaintiff also grocery shops with his mother and helps carry the

groceries. [R. 68]. He stays to himself and does not socialize. [R. 69]. He reads the Bible and watches television. [R. 69].

Plaintiff's mother, Gloria Bellamy, testified next at the hearing. [R. 70]. According to Ms. Bellamy, Plaintiff has always resided with her. [R. 70]. He has had a number of jobs and most recently worked at Logger's Run Middle School in the kitchen. [R. 71-72]. The manager at the school noticed that Plaintiff was talking to himself and said Plaintiff needed help. [R. 72]. Plaintiff's mental issues started in 2016 when he was acting strange, did not know where he was, and the police took him to jail. [R. 72-73]. There was a second incident in 2017 when Plaintiff wandered off and was ultimately Baker-acted by the police. [R. 73-74]. After that, Plaintiff began going to South County Mental Health Center ("South County") for treatment and had been going for about a year and a half prior to the hearing. [R. 75]. Plaintiff finally understood that he needed help and has been taking his medications. [R. 75].

According to Ms. Bellamy, every month Plaintiff gets a shot of Haldol, and the doctor doubled it the month before the hearing because of Plaintiff's hallucinations. [R. 75-76]. Plaintiff's mental condition appeared to improve, but he stated that he had begun to hear voices again the week or two before the hearing. [R. 76]. Ms. Bellamy is concerned about Plaintiff committing suicide because his father did. [R. 77]. Plaintiff's medications help him, and he is able to sleep. [R. 77]. During the day, he paces, walks, and smokes cigarettes. [R. 78]. He does clean the house, but partially just because his mother wants to keep him busy. [R. 78]. Plaintiff used to be a people person, but he is now withdrawn. [R. 79].

Crystal Younger, the vocational expert, testified by telephone at the hearing. [R. 80]. The ALJ first posed a hypothetical in which an individual of the same age and education as Plaintiff

could remember and understand instructions for simple, routine tasks; could maintain concentration, pace, or persistence to complete those tasks over eight hours between customary breaks; could interact occasionally with co-workers and supervisors for short periods of time regarding work-related matters, but could only have incidental contact with the public; could adapt to simple, routine changes in the workplace with normal guidance; and could exercise appropriate judgment on simple, routine work matters. [R. 81]. The vocational expert explained that such an individual could perform work generally available in the economy. [R. 82]. The ALJ asked the vocational expert to list three light jobs that the hypothetical individual could perform, and she listed cleaner, silver wrapper, and packer. [R. 82]. The vocational expert stated that her testimony was consistent with the DOT and her own education, experience, and training. [R. 82].

The ALJ posed a second hypothetical in which an individual had the same limitations stated above except he could <u>not</u> maintain concentration, pace, or persistence to complete those tasks over eight hours between customary breaks and could <u>not</u> exercise appropriate judgment on simple, routine work matters. [R. 82-83]. The vocational expert testified that such an individual could not perform any work that is generally available in the economy. [R. 83]. The vocational expert again stated that her testimony was consistent with the DOT and her own education, experience, and training. [R. 83].

B.  Medical Record Evidence

In reaching his decision to partially grant and partially deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below. The Court notes that any medical records that precede January 20, 2018, are not summarized herein as the ALJ found Plaintiff to be disabled up to that date, and the parties

do not dispute that Plaintiff was disabled up until January 20, 2018. The dispute here is whether or not Plaintiff remained disabled after January 20, 2018, or whether he medically improved after that date. Additionally, Plaintiff is not arguing that the ALJ erred in finding his physical medical issues to be non-severe; therefore, the Court will likewise not summarize any of those records related to Plaintiff's physical medical issues.

On January 19, 2018, a crucial date in this case since the ALJ determined that Plaintiff was no longer disabled as of January 20, 2018, Plaintiff presented to South County for treatment of mood disturbances and psychosis. [R. 376]. At that time, Plaintiff had not been consistently taking his medications for his diagnosed "other specified schizophrenia spectrum and other psychotic disorder." [R. 376]. He was instructed to take the medications prescribed to him (Zyprexa and Trazodone) regularly. [R. 376]. It was noted that Plaintiff had a GAF of 55. [R. 376].

On February 27, 2018, Plaintiff presented to South County and reported that he had been compliant with his medications for approximately one month and had not suffered any adverse effects from them. [R. 403]. Plaintiff stated that his sleep, appetite and mood were all adequate, and he was not having thoughts of hurting himself or others. [R. 403]. He was working and having no problems at work. [R. 403]. Plaintiff did not appear to be in any psychosis. [R. 403]. It was determined that Plaintiff had a GAF of 55, and he was prescribed Zyprexa and Trazodone for his diagnosed "other specified schizophrenia spectrum and other psychotic disorder." [R. 403-4].

On April 24, 2018, Plaintiff presented to South County and reported that he had been compliant with his medications and had not suffered any adverse effects from them. [R. 401]. Plaintiff stated that his sleep, appetite and mood were all adequate, and he was not having thoughts of hurting himself or others. [R. 401]. He was working and having no problems at work. [R. 401].

6

Plaintiff did not appear to be in any psychosis. [R. 401]. It was determined that Plaintiff had a GAF of 55, and he was prescribed Zyprexa and Trazodone. [R. 401].

On April 30, 2018, Plaintiff presented to Dr. Mark Rogovin. [R. 392-93]. Plaintiff reported a history of anxiety, paranoia, depression, and insomnia, as well as visual and auditory hallucinations. [R. 392]. Upon examination of Plaintiff, Dr. Rogovin noted that Plaintiff had no acute signs of psychosis or neurosis. [R. 392]. The doctor's impression was that Plaintiff suffered from anxiety, depression, insomnia, visual and auditory hallucinations, and paranoia. [R. 393].

In a Disability Determination Explanation at the Initial Level dated May 4, 2018, Dr. Richard Willens determined Plaintiff's Residual Functional Capacity ("RFC"), and the State disability adjudicator/examiner, Rona Thompson, determined that Plaintiff was not disabled. [R. 85-96].

On May 25, 2018, Plaintiff presented to South County and reported hearing male voices that were tormenting him and telling him to hurt himself. [R. 399]. Plaintiff also reported poor sleep, mood swings, occasional suicidal thoughts, and seeing things such as snakes. [R. 399]. He stated that his medications were well-tolerated. [R. 399]. Plaintiff explained that he was unable to work and was staying at home with his mother. [R. 399]. Plaintiff's GAF was determined to be 45. [R. 399]. He was prescribed Haldol, Zyprexa and Trazodone. [R. 399].

On June 13, 2018, Plaintiff presented to South County after he had been without his medications for over a week. [R. 397]. All of his symptoms had returned, including hearing voices, seeing snakes, trouble sleeping, mood swings, and suicidal thoughts. [R. 397]. Plaintiff's mother reported that Plaintiff's behavior and ability to sleep had changed without the medications, and that, while on medications, he had been doing "well." [R. 397]. Plaintiff and his mother reported

no adverse side effects to the medications. [R. 397]. It was noted that Plaintiff had recently started taking Haldol, along with Zyprexa and Trazodone. [R. 397]. Plaintiff's mother also stated that Plaintiff was no longer able to work. [R. 397]. Plaintiff's GAF was determined to be 45. [R. 397]. He was provided with refills of his three medications. [R. 397].

On July 11, 2018, Plaintiff presented to South County and reported that his symptoms such as hearing voices and seeing visions had gone away. [R. 412]. Plaintiff's mother noted a positive difference in Plaintiff's behavior and sleep when he was taking the medications. [R. 412]. Plaintiff reported that his sleep and appetite were good, and his mood had been more stable lately. [R. 412]. He had no thoughts of hurting himself or others. [R. 412]. Plaintiff's GAF was determined to be 45. [R. 412]. Plaintiff's Haldol, Zyprexa and Trazodone were continued. [R. 412].

In a Disability Determination Explanation at the Reconsideration Level dated July 12, 2018, Dr. Kevin Ragsdale determined Plaintiff's RFC, and the State disability adjudicator/examiner, Alisha Remarck, determined that Plaintiff was not disabled. [R. 112-125].

On August 8, 2018, Plaintiff presented to South County and reported that his symptoms such as hearing voices and seeing visions had returned that month. [R. 410]. He had been pacing and talking to himself. [R. 410]. Plaintiff reported that his sleep and appetite were good, but his mood had declined. [R. 410]. He had no thoughts of hurting himself or others. [R. 410]. Plaintiff's mother requested a letter stating that Plaintiff was not able to work yet. [R. 410]. Plaintiff's GAF was determined to be 45. [R. 408]. Because of the return of his symptoms, Plaintiff's Haldol dose was increased, and he was instructed to continue taking Zyprexa and Trazodone. [R. 410-11].

On September 5, 2018, Plaintiff presented to South County and reported that his symptoms, such as hearing voices and seeing visions, had returned and were bothering him. [R. 408].

Plaintiff's mother reported that Plaintiff was talking to himself at night and fighting in his sleep. [R. 408]. It was noted that the Haldol had caused a slight occasional hand tremor. [R. 408]. Plaintiff reported that his sleep was poor, and his mood had declined, but he had no thoughts of hurting himself or others. [R. 408]. Plaintiff's GAF was determined to be 45. [R. 408]. Because of the return of his symptoms, Plaintiff's Haldol dose was increased, and he was instructed to continue taking Zyprexa and Trazodone. [R. 408-9].

On October 4, 2018, Plaintiff presented to South County and reported that his symptoms, such as hearing voices and seeing visions, had returned and were bothering him. [R. 424]. Plaintiff's mother reported that Plaintiff was talking to himself more. [R. 424]. It was noted that Plaintiff had a slight occasional hand tremor from the Haldol, but no other side effects. [R. 424]. Plaintiff reported that his sleep had improved with medication, his appetite was fair, and his mood had improved slightly. [R. 424]. Plaintiff reported that he had had passive thoughts of suicide at times, but no actual plans. [R. 424]. Plaintiff's GAF was determined to be 45. [R. 408]. Because of the return of his symptoms, Plaintiff's Haldol and Trazodone doses were increased, and he was instructed to continue taking Zyprexa. [R. 424-25].

On November 13, 2018, Plaintiff presented to South County and reported that his symptoms, such as hearing voices and seeing visions, had been better with increased Haldol. [R. 422]. He stated that his sleep had improved, and his appetite was fair. [R. 422]. Plaintiff reported that he had had passive thoughts of suicide at times, but no actual plans. [R. 422]. Plaintiff's GAF was determined to be 45. [R. 422]. Plaintiff was instructed to continue taking Haldol, Zyprexa and Trazodone. [R. 422].

On December 11, 2018, Plaintiff presented to South County and reported that his

symptoms, including hearing voices and seeing visions, had gotten bad again. [R. 420]. Plaintiff explained that he frequently heard conversations in his head about supernatural things and that the voices also told him to hurt himself and commit suicide. [R. 420]. Plaintiff's mother stated that he had been self-isolating, pacing a lot, acting lazy, and refusing to do housework; however, he was sleeping better. [R. 420]. Plaintiff reported that he was having passive thoughts of suicide at times, but no actual plans. [R. 420]. Plaintiff's GAF was determined to be 45. [R. 420]. Plaintiff was prescribed Depakote for the first time, and he was instructed to continue taking Zyprexa, Trazodone, and Haldol. [R. 420-21].

On January 8, 2019, Plaintiff presented to South County and reported he had been taking his medications and had suffered no major side effects from them. [R. 418]. Plaintiff also reported that his symptoms and mood had improved since he had started taking Depakote the prior month and that he was able to tune out the voices in his head with music. [R. 418]. Plaintiff's mother reported that, when Plaintiff runs out of medications, he gets "a bit agitated." [R. 418]. Plaintiff stated that he had passive thoughts of suicide at times, but no actual plans. [R. 418]. Plaintiff's GAF was determined to be 45. [R. 418]. Plaintiff's Haldol dose was increased, and he was instructed to continue taking Zyprexa, Trazodone, and Depakote. [R. 419].

On February 5, 2019, Plaintiff presented to South County and reported he had been taking his medications and had suffered no major side effects from them. [R. 416]. Plaintiff also reported that his symptoms and mood had improved since he had started taking Depakote and that he was better able to tune out the voices in his head. [R. 416]. It was noted that Plaintiff's labs from January 8, 2019, showed that his valproic acid levels were low at 39.4. [R. 416]. Plaintiff's GAF was determined to be 45. [R. 415]. Plaintiff's Depakote dose was increased, and he was instructed

to continue taking Zyprexa, Trazodone, and Haldol. [R. 417].

On June 17, 2019, Plaintiff presented to Dr. Alejandro J. Arias upon a referral for a General Clinical Evaluation with Mental Status by the Office of Disability Determination. [R. 448]. Plaintiff arrived with his mother and was noted to have a "wide-eyed stare." [R. 448]. He reported that his sleep and appetite were good while he was on his medications. [R. 448]. Plaintiff's mother explained that he cannot function without his medications; when not on his medications, Plaintiff develops suicidal ideations, becomes very irritable, suffers from hallucinations of snakes chasing him, gets confused and disoriented, has illogical conversations, paces the house, and has a blank stare. [R. 448-49]. She also stated that Plaintiff was once social but had become withdrawn. [R. 449]. Plaintiff stated that his moods change, and he is no longer happy like he used to be. [R. 449]. According to Plaintiff's mother, he paces constantly, but he can do his own laundry and his own cooking with supervision. [R. 449].

When Dr. Arias completed the mental status evaluation, he noted that Plaintiff was cooperative and motivated, displayed good eye contact, had slow and deliberate speech, had euthymic mood and somewhat blunted affect, and denied suicidal/homicidal ideation, plan or intent. [R. 449]. Plaintiff told Dr. Arias that he had heard voices as recently as the prior day, wears headphones to block out the voices, is bullied by the voices, and sees things in the shadows. [R. 449]. Dr. Arias found that Plaintiff would require supervision in managing personal funds. [R. 450]. He explained, "[a]t this time, Mr. Bellamy appears to be somewhat stable with psychiatric medications. There are strong indications that without his medications, he will have severe behavioral decompensation, likely requiring inpatient hospitalization for stabilization." [R. 450].

Dr. Arias completed a Medical Source Statement of Ability to Do Work-Related Activities

(Mental). [R. 451-53]. He determined that Plaintiff had moderate limitations in the ability to understand and remember complex instructions, to carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting. [R. 451-52]. Dr. Arias found that Plaintiff also had mild limitations in his ability to interact appropriately with both the public and supervisors. [R. 452]. Finally, Dr. Arias determined that Plaintiff had no limitations in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. [R. 452].[3]

C.   ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on August 7, 2019. [R. 20-40]. The ALJ first found that Plaintiff had acquired sufficient quarters of coverage to remain insured through March 31, 2021. [R. 23]. He next found that Plaintiff was disabled within the meaning of the Social Security Act from December 20, 2016, through January 19, 2018, and that the insured status requirements of the Social Security Act were met as of the date disability was established. [R. 24]. These findings of the ALJ are not disputed by the parties.

The ALJ further concluded, however, that, as of January 20, 2018, "medical improvement

---

[3] On September 5, 2019, after the date of the ALJ's decision in this case, but before the decision of the Appeals Council, Plaintiff presented to Bethesda Hospital East with an adverse reaction to a drug, an altered or impaired mental status, a cognitive disorder, a medium knowledge deficit, cellulitis, and an abscess of the lower leg. [R. 3-9]. He was drowsy and lethargic, oriented to person, and had an unsteady gait. [R. 5-6]. It was noted that he had severe encephalopathy and was unable to walk. [R. 6]. Plaintiff had worsening muscle weakness with confused speech and multiple falls, as well as worsening psychiatric symptoms. [R. 7]. The MR angiography of Plaintiff's head and the MRI of his brain were normal. [R. 7-8]. Even though these records preceded the Appeals Council's decision, they appear to have been received on September 27, 2019, after the date of the Appeals Council's decision. Neither party mentions these records in their motions for summary judgment. Nor has Plaintiff provided any reason that the Court should consider this new evidence. Thus, the Court will not consider the records in its analysis. However, upon remand, this evidence may be considered by the Commissioner, if appropriate.

occurred that is related to the ability to work, and [Plaintiff] has been able to perform substantial gainful activity from that date through the date of this decision. Thus, [Plaintiff's] disability ended on January 20, 2018." [R. 24]. It is this later finding by the ALJ of Plaintiff's medical improvement and ability to perform substantial gainful activity as of January 20, 2018, that is disputed in this case.

The ALJ determined that, between December 20, 2016, and January 20, 2018, Plaintiff suffered from the following severe impairments: schizophrenia, psychosis, personality disorder, and impulse control disorder. [R. 27]. However, he determined that Plaintiff's mild intermittent asthma, acute kidney failure, and drug and alcohol abuse disorder were non-severe impairments and that Plaintiff's hepatitis C was a non-medically determinable impairment. [R. 27-28]. Next, the ALJ found that, between December 20, 2016, and January 20, 2018, Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 28]. The ALJ determined that, during the relevant period of time (December 20, 2016, through January 20, 2018), Plaintiff had the following residual functional capacity:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand and remember instructions for simple and routine tasks. The claimant cannot maintain concentration, persistence, or pace to complete simple and routine tasks over an 8-hour period between scheduled breaks. He can interact occasionally with co-workers, supervisors for short periods of time regarding work related matters, and he should have only incidental contact with the public. The claimant can adapt to simple routine changes in the work place with normal guidance, but cannot exercise appropriate judgment on simple routine work matters.

[R. 28-29].

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 29]. The ALJ found that Plaintiff's hearing testimony was credible and consistent with the record evidence for the time period of December 20, 2016, through January 20, 2018. [R. 29]. Next, the ALJ summarized the various medical records and found that "these consistently abnormal findings support a claim of a longstanding debilitating condition." [R. 29]. The ALJ did not find the opinions of the State agency psychologists (who found Plaintiff not to be disabled) persuasive because they were not supported by the medical record and did not seem to take into account the multiple Baker Act admissions or Plaintiff's bizarre behavior and auditory/visual hallucinations. [R. 30].

The ALJ explained that Plaintiff has no past relevant work, was a younger individual on the established disability onset date, has a high school education, and is able to communicate in English. In considering all of these factors, the ALJ concluded that there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed between December 20, 2016, and January 20, 2018. [R. 30]. He relied on the testimony of the vocational expert. [R. 31]. Again, as noted above, these findings of the ALJ are not disputed by the parties.

The ALJ next determined, however, that Plaintiff did not develop any new impairment or impairments after January 20, 2018, the date Plaintiff's disability ended. [R. 31]. He found that, beginning on January 20, 2018, Plaintiff has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 31]. The ALJ's finding was based on his determination that, starting on January 20, 2018, Plaintiff medically improved because he had received psychotropic medications at South County. [R. 31].

14

The ALJ found that, as of January 20, 2018, Plaintiff had the following residual functional capacity:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand and remember instructions for simple and routine tasks. He can maintain concentration, persistence, or pace to complete simple and routine tasks over an 8-hour period between scheduled breaks. The claimant can interact occasionally with co-workers, supervisors for short periods of time regarding work related matters, and should have only incidental contact with the public. The claimant can adapt to simple routine changes in the work place with normal guidance and exercise appropriate judgment on simple routine work matters.

[R. 32-33].

The ALJ determined that, regarding the period after January 20, 2018, Plaintiff's hearing testimony concerning the intensity, persistence, and limiting effects of his symptoms was not entirely consistent with the medical evidence and other evidence. [R. 33]. The ALJ then summarized the relevant medical evidence in detail. [R. 33-34]. He found the opinion of Dr. Arias, the psychological consultative examiner, to be persuasive. [R. 34]. Dr. Arias determined that, when Plaintiff was compliant with his medication, he was capable of simple and routine tasks. [R. 34]. Finally, the ALJ relied on the vocational expert's testimony and found that, beginning January 20, 2018, there have been jobs that exist in significant numbers in the national economy that Plaintiff can perform. [R. 34-35]. Thus, the ALJ stated that Plaintiff's disability ended on January 20, 2018, and he has not become disabled again since that date. [R. 35].

## II. **MOTIONS FOR SUMMARY JUDGMENT**

In his Motion for Summary Judgment, Plaintiff asserts that the ALJ's determination that Plaintiff's medical condition improved and that he then became "not disabled" is not supported by the substantial evidence in the record. [DE 31]. Plaintiff argues both that the medical evidence

does not support the adjusted RFC and that the ALJ improperly discounted Plaintiff's testimony regarding the severity of his symptoms and his ability to maintain employment. *Id.*

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, Defendant asserts that substantial evidence supports the ALJ's RFC finding for the time period beginning on January 20, 2018, and substantial evidence supports the ALJ's symptom assessment. [DE 35].

In reply, Plaintiff argues the ALJ's determination that Plaintiff experienced a medical improvement that rendered him no longer disabled was not based on the record as a whole, but rather was improperly based on isolated portions of the record. [DE 38]. Plaintiff also contends that the ALJ improperly failed to address Plaintiff's GAF scores. *Id.*

### III. <u>RELEVANT LAW</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921

F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining [that] the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The

burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

Next, an ALJ's determination of whether a claimant's eligibility has ended for disability benefits involves an eight-step process under Title II (DIB) and a seven-step process under Title XVI (SSI). *See* 20 C.F.R. §§ 404.1594(f)(1)–(8); 20 C.F.R. § 416.994(b)(5)(i)–(vii).

Social Security Regulations establish an eight-step evaluation process to determine whether a claimant's medical condition has improved or if a disability continues. *See* 20 C.F.R. § 404.1594(f). The first step is determining whether the claimant is engaged in substantial gainful activity. If so, a finding of a disability status will end. § 404.1594(f)(1). If not, the ALJ proceeds to step two.

At step two, the ALJ must determine whether the claimant suffers from an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1, Subpart P of Regulations No. 4. If so, the disability will be found to continue. § 404.1594(f)(2).

At step three, the ALJ must determine whether there has been medical improvement in the claimant's condition. § 404.1594(f)(3). Medical improvement is defined as any decrease in the medical severity of any impairment which was present at the time of the most recent favorable decision finding the claimant disabled. § 404.1594(b)(1).

At step four, the ALJ must determine whether the improvement relates to the claimant's ability to do work. § 404.1594(f)(4). If the improvement does relate, the analysis skips to step six. If there has not been medical improvement, the ALJ considers whether an exception to medical improvement applies. § 404.1594(d)(e). If there has been no medical improvement or medical improvement is not related to the claimant's ability to work, the evaluation proceeds to step five.

At step five, consideration is given to whether the case meets any of the special exceptions to medical improvement for determining that disability has ceased. 20 C.F.R. §§ 404.1594(f)(5), 416.994(b)(5)(iv).

At step six, if the medical improvement is shown to be related to the claimant's ability to work, the ALJ must determine whether the claimant's current impairments in combination are severe. If the impairments do not significantly limit the claimant's ability to perform basic work activities, then the claimant is no longer disabled. 20 CFR § 404.1594(f)(6); *see also Rockhill v. Saul*, No. 19-14001-CIV, 2020 WL 1445621, at *8 (S.D. Fla. Feb. 7, 2020).

At step seven, the ALJ must assess the claimant's RFC based on the claimant's current impairments. 20 CFR § 404.1594(f)(7).

At step eight, which applies for Plaintiff's Title II claim (but not for his Title XVI claim), the ALJ must determine whether work exists that the claimant can perform, given the claimant's age, education, and residual functional capacity. If the claimant can perform other work and that work exists in significant numbers in the national economy, then the claimant is no longer disabled. If the claimant cannot perform other work, then the claimant's disability continues. § 404.1594(f)(8); 20 CFR § 416.994(b)(5)(vii); *see also Rockhill*, 2020 WL 1445621, at *8.

When an ALJ is determining whether a disability has ended with regard to Title XVI (SSI),

the Regulations mandate a seven-step sequential inquiry. 20 C.F.R. §§ 404.1594(f)(5), 416.994(b)(5). This sequential inquiry requires the ALJ to determine whether a claimant (1) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (2) has experienced medical improvement; (3) has experienced medical improvement that is related to the ability to work; (4) has experienced medical improvement, but an exception to the medical improvement applies; (5) has current impairments that when considered in combination are severe; (6) can perform past relevant work; and (7) can perform other work that exists in the national economy. 20 C.F.R. §§ 404.1594(f), 416.994(b); *De La Torre v. Berryhill*, No. 16-CIV-24339, 2018 WL 1570362, at *4 (S.D. Fla. Mar. 30, 2018).

"In a cessation of benefits case, the burden is on the Commissioner to prove that the claimant is no longer disabled as of the cessation date because the Plaintiff has experienced 'medical improvement.'" *Mesa v. Saul*, No. 1:19-CV-21736, 2020 WL 4932831, at *2–3 (S.D. Fla. Aug. 24, 2020), *report and recommendation adopted sub nom. Mesa v. Berryhill*, No. 19-21736-CIV, 2020 WL 5028789 (S.D. Fla. Aug. 24, 2020) (citing *Olivo v. Colvin*, No. 6:16-cv-259-Orl-40JRK, 2017 WL 708743, at *2 (M.D. Fla. Jan. 30, 2017)); *see also Soto, v. Comm'r of Soc. Sec. Admin.*, No. 5:19-CV-568-OC-MAP, 2020 WL 4048210, at *2 (M.D. Fla. July 20, 2020).

## IV. <u>ANALYSIS</u>

In his Motion for Summary Judgment, Plaintiff first argues that the substantial record evidence does not support that he experienced a significant medical improvement that could have resulted in the ALJ's adjusted RFC. [DE 31, p. 14]. Plaintiff contends that the medical records show that his condition markedly worsened in May 2018 and that his mental health fluctuated throughout 2018. *Id.* at pp. 14-16. Plaintiff additionally asserts that the ALJ improperly discounted

his hearing testimony regarding the severity of his symptoms and his ability to work after January 20, 2018. *Id.* at pp. 16-20.

In his Motion for Summary Judgment, Defendant maintains that substantial evidence supports the ALJ's findings for the period starting on January 20, 2018. [DE 35, pp. 8-11]. Defendant also asserts that substantial evidence supports the ALJ's assessment of Plaintiff's symptoms. *Id.* at pp. 11-14.

In reply, Plaintiff argues that the ALJ's determination that Plaintiff experienced a medical improvement that rendered him no longer disabled was improperly based on portions of the records, rather than the whole record. [DE 38, pp. 2-9]. He details all of the evidence from the record that he believes supports his position. *Id.* Plaintiff further asserts that the ALJ erred by failing to address Plaintiff's low GAF scores. *Id.* at pp. 9-10.

(a) <u>Whether the ALJ Improperly Failed to Consider Plaintiff's Low GAF Scores</u>

The Court first considers Plaintiff's argument that the ALJ failed to consider Plaintiff's low GAF scores. "Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. . . . A GAF of 41-50 indicates either serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning." *Sanchez v. Saul*, No. 18-23981-CIV, 2019 WL 6879812, at *2 (S.D. Fla. Nov. 26, 2019), *report and recommendation adopted,* No. 18-23981-CIV, 2019 WL 6877696 (S.D. Fla. Dec. 17, 2019) (quoting *Vargas v. Astrue*, No. 07-CV-60776, 2008 WL 4056164, at *3 (S.D. Fla. Aug. 25, 2008)) (alterations in original) (citations and quotations omitted). However, "[t]he Commissioner has declined to endorse the GAF scale 'for use in the Social Security and SSI

disability programs,' and has indicated that GAF scores have 'no direct correlation to the severity requirements of the mental disorders listings.'" *Julien v. Saul*, No. 18-23311-CIV, 2020 WL 1326428, at *22 (S.D. Fla. Jan. 30, 2020), *report and recommendation adopted,* No. 18-23311-CIV, 2020 WL 1322786 (S.D. Fla. Mar. 20, 2020) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005)). In sum, "GAF scores may be helpful in formulating a claimant's RFC, but are not essential to the RFC's accuracy, and an ALJ's failure to describe GAF scores does not render the ALJ's RFC assessment inaccurate." *Id.* (quoting *Thornton v. Comm'r of Soc. Sec.*, 597 F. App'x 604, 613 (11th Cir. 2015)); *see also Buckwalter v. Saul*, No. 18-14506-CIV, 2019 WL 4277487, at *1 (S.D. Fla. Sept. 10, 2019) (noting that a GAF score of 50 to 41 indicates a serious condition that causes serious impairment of social, occupational, or school functioning, but explaining that the ALJ expressly and properly excluded them from his analysis as the Commissioner directed at 65 Fed. Reg. 50745 (Aug. 21, 2000)).

Therefore, based upon the applicable law, this Court finds that the ALJ's failure to consider Plaintiff's low GAF scores does not render the RFC assessment for Plaintiff for the time period after January 20, 2018 inaccurate.

### (b) Whether the ALJ Properly Discounted Plaintiff's Testimony as to the Severity of His Symptoms and Ability to Work After January 20, 2018

Next, the Court must determine whether the ALJ properly discounted Plaintiff's testimony as to the severity of his symptoms and his ability to work after January 20, 2018. The regulations require the ALJ to consider specific factors when making credibility determinations. Those factors include the claimant's daily activities; the location, duration, frequency and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications; treatment other than medication; and any other measures to reduce pain

22

or other symptoms. 20 C.F.R. § 404.1529(c)(3). The ALJ must provide specific reasons for his credibility determination and the weight given to subjective statements, which must be supported by the record. 20 C.F.R. § 404.1529(c)(4) (noting that subjective complaints are evaluated in relation to other evidence).

In the ALJ's decision, he found Plaintiff's hearing testimony to be credible and consistent with the record evidence for the time period between December 20, 2016, and January 19, 2018. [R. 29]. However, the ALJ found Plaintiff's hearing testimony—elicited at the very same hearing—to not be completely consistent with the record evidence for the time period starting on January 20, 2018. [R. 33]. The ALJ did not fully explain this remarkable change in credibility of Plaintiff, and it seems to have no basis in the record.

The treating physician records from South County paint a much different picture than the ALJ's findings in the decision. January 19, 2018—the date the ALJ chose as the last date upon which Plaintiff was disabled—was the first time Plaintiff went to South County and obtained medications to treat his diagnosed mental health illness. [R. 376]. However, Plaintiff's medical condition did not significantly improve to the point he became not disabled on the day after he started taking the medications. For example, after he had been on medication for several months, in August 2018, Plaintiff reported that his symptoms such as hearing voices and seeing visions had returned, and his Haldol dose was increased by medical personnel at South County. [R. 410-11].

On October 4, 2018, Plaintiff reported that his symptoms had returned and were bothering him, and his Haldol and Trazodone doses were increased. [R. 424-25]. On November 13, 2018, Plaintiff reported improvement, but then, on December 11, 2018, Plaintiff reported that his symptoms, including hearing voices and seeing visions, had gotten bad again. [R. 420, 422].

23

In December 2018, Plaintiff explained during an appointment at South County that he frequently heard conversations in his head about supernatural things and that the voices also told him to hurt himself and commit suicide. [R. 420]. Plaintiff's mother stated that he had been self-isolating and pacing a lot. [R. 420]. Plaintiff reported that he was having passive thoughts of suicide at times, but no actual plans. [R. 420]. Plaintiff was prescribed Depakote for the first time, and he was instructed to continue taking Zyprexa, Trazodone, and Haldol. [R. 420-21].

While, on January 8, 2019, Plaintiff reported he had been taking his medications and had suffered no major side effects from them, Plaintiff's Haldol dose was still increased, and he was instructed to continue taking Zyprexa, Trazodone, and Depakote. [R. 419]. On February 5, 2019, Plaintiff reported improvement, but his Depakote dose was still increased. [R. 417-18].

The record simply does not support the ALJ's finding as to Plaintiff's credibility for the time period starting on January 20, 2018. While Plaintiff saw some monthly improvements in the beginning of 2018, it is clear from the record that the improvements were not steadily maintained. Instead, Plaintiff regressed often. The ALJ noted that the medical record's abnormal findings support a long-standing debilitating condition of Plaintiff. [R. 29]. Although Plaintiff may be able to perform some "simple and routine tasks" while the medications are effective, the record shows that that is not always the case.

The record evidence shows that Plaintiff's functional problems remained even after his schizophrenia, psychosis, personality disorder, and impulse control disorder were brought under some semblance of control through the use of medications. The record evidence also establishes that, for the most part, Plaintiff has struggled with both self-care and social interactions. He has experienced phases of increased symptoms even as medications seemed to temporarily

24

improve his condition overall. Ultimately, this is for the fact-finder to weigh out, but it is clear that Plaintiff's history is more complicated than the ALJ suggests in his decision. The ALJ seems to have placed great emphasis on those particular factors that suggest normal functional ability as of January 20, 2018 but without taking into account the full context and without taking into account those factors that suggest impairment. When the entire record is considered, there is not substantial evidence which supports a change in Plaintiff's credibility from pre-January 20, 2018 to post-January 20, 2018. Upon careful review, this Court does not find the ALJ's post-January 20, 2018 credibility finding to enjoy sufficient evidentiary support. *See Hill v. Berryhill*, No. 17-14262-CIV, 2018 WL 6048006, at *9 (S.D. Fla. Nov. 19, 2018).

In light of the fact that the ALJ's credibility finding for the period beginning on January 20, 2018, is not sufficiently supported by the record, this case is due to be remanded.

(c) Whether the ALJ's Decision is Supported by Substantial Evidence

Finally, the Court must determine whether the ALJ's decision is supported by substantial evidence. The Court finds that the ALJ's decision is not.

It must first be noted that the ALJ did not find the opinions of the State agency psychologists persuasive because they were not supported by the medical record and did not seem to take into account the multiple Baker Act admissions or Plaintiff's bizarre behavior and auditory/visual hallucinations. [R. 30]. In other words, the ALJ disagreed with the State agency psychologists to Plaintiff's benefit.

The ALJ did find the opinion of Dr. Arias, the psychological consultative examiner, to be persuasive. [R. 34]. However, Dr. Arias only examined Plaintiff once and never actually treated him. Moreover, when Plaintiff presented to Dr. Arias for the first and only time on June 17, 2019,

Dr. Arias noted that Plaintiff had a "wide-eyed stare." [R. 448]. Plaintiff reported to Dr. Arias that he had heard voices as recently as the prior day, wears headphones to block out the voices, is bullied by the voices, and sees things in the shadows. [R. 449]. Dr. Arias found that Plaintiff would require supervision in managing personal funds, before concluding, "[a]t this time, Mr. Bellamy appears to be somewhat stable with psychiatric medications. There are strong indications that without his medications, he will have severe behavioral decompensation, likely requiring inpatient hospitalization for stabilization." [R. 450]. Not only is Dr. Arias' opinion somewhat internally inconsistent, but it is inconsistent with the South County records summarized above.

The ALJ's decision appears to disregard the increased dosage of Haldol and other prescriptions, as well as the many periods of time when Plaintiff's symptoms returned. It seems that the ALJ relied on the opinion of Dr. Arias, who only evaluated Plaintiff once and did not treat Plaintiff. The ALJ did not properly weigh the evidence on the record from the Plaintiff's treatment at South County in relation to Dr. Arias' opinion.

In sum, the record simply does not support the ALJ's finding that Plaintiff was no longer disabled as of the cessation date of January 20, 2018, because Plaintiff experienced "medical improvement." *See McAulay v. Heckler*, 749 F.2d 1500, 1500 (11th Cir. 1985) ("This court has held that there can be no termination of benefits unless there is substantial evidence of improvement to the point of no disability."). The date of January 20, 2018 seems to be an arbitrary date not supported by substantial evidence. The record does not contain substantial evidence of Plaintiff's improvement to the point of no disability as of January 20, 2018.

It should be noted that Dr. Arias did not even examine Plaintiff until June 17, 2019. Even if the ALJ were correct in putting so much credence in Dr. Arias' findings, Dr. Arias did not

examine Plaintiff while his mental status was cyclically improving and deteriorating from January 2018 through June 2019. His findings are limited to the time of his June 2019 examination of Plaintiff. Dr. Arias did not take into account the various medications and doses of those medications that Plaintiff had been prescribed between January 2018 and June 2019.

Additionally, on June 17, 2019, Dr. Arias noted that Plaintiff would decompensate and likely be hospitalized without his medications. Thus, there is really no evidentiary support whatsoever for the ALJ's finding that Plaintiff immediately showed medical improvement to the point where he was no longer disabled on January 20, 2018, just because he had received psychiatric medication the previous day. Moreover, it was the ALJ's burden to prove, in all relevant respects, that Plaintiff was no longer disabled as of the cessation date. *Townsend v. Comm'r of Soc. Sec.*, No. 6:13-CV-1783-ORL-DAB, 2015 WL 777630, at *3 (M.D. Fla. Feb. 24, 2015). The ALJ failed to meet this burden. Thus, this case is due to be remanded.[4]

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  The decision of the Commissioner is **REVERSED AND REMANDED** pursuant to

---

[4] Neither Dr. Arias nor the ALJ addressed whether Plaintiff, in light of his severe mental impairments, even has the ability to consistently take his medications. The ALJ's decision made the finding that, starting on January 20, 2018, Plaintiff medically improved because Plaintiff had received psychotropic medications at South County. [R. 31]. There would likely be a significant difference between a mentally ill individual *receiving* his medications and *taking* his medications. According to Dr. Arias, without his medications, Plaintiff will likely have severe behavioral decompensation, likely requiring inpatient hospitalization for stabilization. [R. 450]. Neither the ALJ nor Dr. Arias addressed whether or not a by-product or symptom of Plaintiff's mental disease or defects includes an inability to consistently take medications. If Plaintiff, due to a mental disease, defect or impairment, does not have the ability to consistently take his medications, then it would seem that merely making medications available to Plaintiff does not necessarily render him medically improved. See *Melvin v. Berryhill*, No. 4:17-CV-00852-LSC, 2018 WL 4489507, at *5 (N.D. Ala. Sept. 19, 2018) ("The regulations provide that a claimant may be denied benefits for failing to follow prescribed treatment <u>without good reason</u>.") (emphasis added); *see also* 20 C.F.R. §§ 404.1530, 416.930. This, of course, is for the Commissioner to consider upon remand if deemed relevant.

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.[5] Because the Commissioner's final decision is not based on substantial evidence, on remand, the Commissioner should reassess the entire record and reconsider and weigh all available medical records and medical opinion evidence.

2. Based on the agreement of the parties, and without any finding that the ALJ who issued the August 7, 2019 decision in Plaintiff's case was biased, defectively appointed, or otherwise deficient, the case shall be set before a different ALJ upon remand.

3. Accordingly, Plaintiff's Motion for Summary Judgment [DE 31] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment [DE 35] is hereby **DENIED**.

4. The Court specifically finds that this Order, the accompanying Judgment, and the court-ordered remand to the Commissioner, do not constitute a waiver of any party's arguments, challenges, or positions. If necessary, either party may raise any and all such arguments, challenges, or positions at a later date.[6]

5. Judgment will be entered separately.

---

[5] The Court finds that remand pursuant to sentence six of 42 U.S.C. § 405(g) is not appropriate here. Sentence six "provides the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time in the district court." *Ingram*, 496 F.3d at 1267. To be entitled to remand to the Social Security Administration under sentence six, a claimant must show that "(1) there is new, noncumulative evidence; (2) the evidence is material ..., and (3) there is good cause for the failure to submit the evidence at the administrative level." *Gordon v. Soc. Sec. Admin., Comm'r*, 625 F. App'x 512, 514 (11th Cir. 2015) (quoting *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986)). Therefore, sentence six remand is appropriate only in cases where "the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Ingram*, 496 F.3d at 1267 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Here, Plaintiff has not made any argument that the new evidence from September 2019 referenced in footnote 2 is material or that there is good cause for Plaintiff's failure to properly submit the evidence to the Appeals Council.

[6] The undersigned will consider any future appeal when and if it is filed.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 20th day of September, 2021.

WILLIAM MATTHEWMAN
United States Magistrate Judge

29